## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS
### AT KANSAS CITY

| | |
|---|---|
| JAKOB TOBLER and MICHELLE MCNITT, individually and on behalf of all others similarly situated, | CASE NO.: |
| Plaintiffs, | |
| v. | **COMPLAINT – CLASS ACTION** |
| 1248 HOLDINGS, LLC f/k/a BICKNELL FAMILY HOLDING COMPANY; MARINER WEALTH ADVISORS, LLC f/k/a MARINER HOLDINGS, LLC; MONTAGE INVESTMENTS, LLC; MARINER, LLC f/k/a MARINER WEALTH ADVISORS, LLC; MARINER CAPITAL ADVISORS, LLC; TORTOISE CAPITAL ADVISORS, LLC; TORTOISEECOFIN INVESTMENTS, LLC; AMERICAN CENTURY COMPANIES, INC.; AMERICAN CENTURY SERVICES, LLC; AMERICAN CENTURY INVESTMENT MANAGEMENT, INC.; and DOES 1-10, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

JURISDICTION AND VENUE ....................................................................................... 8

THE PARTIES.................................................................................................................. 9

    A.   Plaintiffs............................................................................................................ 9

    B.   Defendants ...................................................................................................... 10

FACTUAL ALLEGATIONS ........................................................................................ 12

    I.   The Asset and Wealth Management Industry ................................................ 12

    II.   Defendants' Conspiracy to Restrict Hiring, Recruiting, and Compensation ................... 20

    III.   The Effects of the No-Poach Conspiracy ...................................................... 21

EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT ................................. 25

CLASS ACTION ALLEGATIONS ............................................................................. 27

CLAIMS FOR RELIEF ................................................................................................ 29

COUNT I ....................................................................................................................... 29

COUNT II ...................................................................................................................... 32

COUNT III ..................................................................................................................... 33

COUNT IV ..................................................................................................................... 35

COUNT V ...................................................................................................................... 36

PRAYER FOR RELIEF ................................................................................................ 37

DEMAND FOR JURY TRIAL AND DESIGNATION OF PLACE OF TRIAL ..................... 38

## CLASS ACTION COMPLAINT

1.      Plaintiffs Jakob Tobler and Michelle McNitt, ("Plaintiffs"), by and through their undersigned counsel, bring this Class Action Complaint against Defendants 1248 Holdings, LLC f/k/a Bicknell Family Holding Company ("Bicknell Family Holding Company"); Mariner Wealth Advisors, LLC f/k/a Mariner Holdings, LLC ("Mariner Holdings, LLC"); Montage Investments, LLC ("Montage"); Mariner, LLC f/k/a Mariner Wealth Advisors, LLC ("Mariner Wealth Advisors"); Mariner Capital Advisors, LLC ("Mariner Capital"); Tortoise Capital Advisors, LLC ("Tortoise"); TortoiseEcofin Investments, LLC ("TortoiseEcofin") (collectively "Mariner"); American Century Companies, Inc.; American Century Services, LLC; and American Century Investment Management, Inc. (collectively "American Century"); and DOES 1-10 (collectively, "Defendants") individually and on behalf of all other similarly situated, and allege as follows, based upon personal knowledge as to themselves, and upon information and belief as to all other matters.[1]

## INTRODUCTION

2.      Gone are the days when corporate competitors could covertly exploit their employees to increase their bottom line through anticompetitive behavior. Over a century has passed since the corporate landscape underwent a seismic shift with the United States government taking a stand against anticompetitive practices. Through this shift, clandestine agreements that

---

[1] On information and belief, there are additional Defendants that cannot be identified at this time and thus, Plaintiffs have marked "DOES 1-10" as placeholders. The evidence described herein confirms that Mariner conspired with its competitors in the industry to unreasonably restrain competition. However, DOJ has not revealed the identity of these competitors. Furthermore, the evidence establishes liability against "all companies in which Montage or Mariner Holdings, LLC had a direct or indirect ownership interest of greater than or equal to 50% during the Relevant Period." The identities of the competitors and of Mariner's related entities are either not publicly disclosed or not easily accessible. Discovery is likely to reveal these remaining identities.

stifle job mobility, opportunity, and innovation, such as anticompetitive *no-poach agreements*, are no longer tolerated. These illegal no-poach agreements allowed competitors to conspire not to hire or recruit each other's employees. Reenforcing this change, in 2016, the Department of Justice (DOJ) and Federal Trade Commission (FTC) jointly released *Antitrust Guidance for Human Resource Professionals*, which warned that DOJ would pursue companies for criminal violations of these no-poach agreements.[2] This stimulated corporate reform, dismantling the web of no-poach agreements that had bound the workforce in silent struggle. But not all companies embraced this sweeping change and the use of anticompetitive and illegal no-poach agreements remained a fixture of Defendants' business practices.

3.      This antitrust action concerns the rights of employees to free and fair markets. "[W]orkers, like consumers, are entitled to the benefits of a competitive market[,]" and "[r]obbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment."[3] But for several years, Defendants—comprising some of the top asset and wealth management companies in the country—conspired to refrain from competition when it came to hiring and recruiting each other's employees.

4.      Defendants secretly agreed to restrict, suppress, and eliminate their competition in the recruitment and hiring of asset and wealth management professionals and other skilled workers ("Asset and Wealth Management Professionals"). Defendants entered into this agreement for one

---

[2] Dep't of Just. & Fed. Trade Commission, *Antitrust Guidance for Human Resource Professionals* (Oct. 2016), https://www.justice.gov/atr/file/903511/download.

[3] U.S. Dep't of Just., *No More No-Poach: The Antitrust Division Continues to Investigate and Prosecute "No-Poach" and Wage-Fixing Agreements*, https://web.archive.org/web/20230330002337/https://www.justice.gov/atr/division-operations/division-update-spring-2018/antitrust-division-continues-investigate-and-prosecute-no-poach-and-wage-fixing-agreements (last visited Feb. 1, 2024).

clear and overarching reason—so they could pay these highly-skilled employees *less* than they would be paid in a competitive market.

5.      Defendants' conspiracy deprived Asset and Wealth Management Professionals of the benefits of competition. By agreeing not to recruit and hire each other's employees, Defendants were able to pay their Asset and Wealth Management Professionals lower wages than would have prevailed in a competitive market and deprived such workers of job opportunities, experience, and many other benefits that accompany professional mobility.

6.      Defendants all draw from, and compete for, the same pool of talent when hiring and recruiting Asset and Wealth Management Professionals.

7.      Success in this industry critically depends on attracting, hiring, and retaining skilled Asset and Wealth Management Professionals. The work done on their portfolios is highly specialized and technical; employees must complete extensive education and training to do their jobs well.

8.      Given the requirements and high skill necessary for Asset and Wealth Management Professionals means that qualified candidates for employment with Defendants are scarce. In a competitive market, the combination of a low supply of candidates and high demand for their skills would lead to higher compensation, an abundance of employment opportunities, and better benefits as companies compete to lure top workers away from competitors and convince their own workers to reject offers from other companies.

9.      That said, Defendants conspired to avoid having to compete with each other to pay their Asset and Wealth Management Professionals a competitive wage. By March 2014, if not earlier, Defendants explicitly agreed not to hire or recruit each other's Asset and Wealth Management Professionals. The purpose and consequence of this unlawful agreement was so that

Defendants could artificially depress their own labor costs, thereby depriving workers of the compensation they would otherwise earn in a competitive marketplace. Defendants expressly discussed this shared objective with each other, and each of them knew that this was the conspiracy's overarching goal.

10.     Adhering to the 2016 Antitrust Guidance, DOJ stayed true to its word. At some point before May 15, 2023, DOJ pursued a criminal investigation into Mariner exposing its *per se* violation of Section 1 of the Sherman Act. As a result of DOJ's criminal investigation, DOJ found evidence of the conspiracy between Defendants that resulted in Mariner executing a Non-Prosecution Agreement ("NPA"). *See* Montage Non-Prosecution Agreement, attached as **Exhibit A**.

11.     DOJ exposed the competitors' conspiracy that surreptitiously flew under radar for years. Through the Non-Prosecution Agreement, Mariner admitted to its illegal, anticompetitive scheme. In return for its cooperation and acceptance of responsibility for violation of the Sherman Act, among other obligations, DOJ agreed not to criminally prosecute Mariner for violation of the Sherman Act giving rise to the NPA.

12.     Specifically, Mariner admitted to and accepted the following conduct and responsibilities:

> The Company admits, acknowledges, and accepts responsibility for the conduct, including that of a senior-level executive, as described in Paragraph 7. Additionally, as set forth in Paragraphs 8 and 9 below, the Company and Related Entities agree not to make any public statement contradicting the admissions set forth in this paragraph:
>
> > (a) Beginning no later than March 2014 and continuing until March 2018 (the "Relevant Period"), Montage and its related entities (including the company formerly known as Mariner Holdings, LLC, as well as companies in which Montage or Mariner Holdings, LLC had a direct or indirect ownership interest of greater than or equal to 50% during the Relevant Period)

("Relevant Related Entities"), through certain of their employees, including a senior-level executive, conspired to suppress and eliminate competition by entering into and managing a bilateral market allocation agreement with another firm with which they compete for asset and wealth management professionals ("Labor Market Competitor") not to solicit, recruit, hire, or otherwise compete for each other's employees, in violation of Title 15 United States Code Section 1. By allocating employees in the labor market between Montage/the Relevant Related Entities and the Labor Market Competitor, this bilateral agreement diminished employee mobility between Montage/the Relevant Related Entities and the Labor Market Competitor, and in that manner, limited the opportunities of employees to negotiate for better compensation, benefits, and other terms of employment through a move to the Labor Market Competitor.

(b)    Montage further admits that the business activities of Montage/the Relevant Related Entities and its co-conspirators in connection with the provision of asset and wealth management services affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce, and that this agreement was not reasonably necessary to any legitimate transaction or collaboration between Montage/the Relevant Related Entities and the Labor Market Competitor.

13.    The Non-Prosecution Agreement also outlined other obligations. Mariner is forbidden "through present or future attorneys . . . [to] make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company[.]" Mariner also agreed to set up a Victim Compensation Fund ("Fund") in the amount of $1,000,000 to compensate current and former employees of Mariner for its violation of Section 1 of the Sherman Act. According to the NPA, Mariner cannot use the fact that any victim seeks or receives compensation from the Fund to preclude that victim from pursuing lawful claims he or she may have against Mariner, and the amount of the Fund is not a limit or cap on liability in any potential future civil litigation.

14.     Like Mariner, American Century also brokered a deal with DOJ to avoid criminal prosecution. American Century agreed to pay current and former employees $1.5 million for violating Section 1 of the Sherman Act through a no-poach agreement with competitors.[4] Under this separate Non-Prosecution Agreement ("NPA-ACI"), American Century "admitted that beginning no later than March 2014 and continuing until at least March 2018, [American Century], through certain of its employees, including a senior-level executive, conspired to suppress and eliminate competition by entering into and managing a bilateral market allocation agreement within firm in the asset and wealth management services industry not to solicit, hire, or otherwise compete for each other's employees in violation of [15 U.S.C. § 1]. This Agreement diminished employee mobility and limited the ability of employees to negotiate for better compensation, benefits, and other terms of employment." On information and belief, Asset and Wealth Management Professionals associated with American Century did not know about the secret no-poach agreement until June 2021, when they received the notice.

15.     Defendants' anticompetitive scheme persisted beyond March 2018. After several years enforcing the unlawful no-poach agreement and denying employment opportunities to competitors' Asset and Wealth Management Professionals, this unlawful scheme left an indelible mark on Defendants' recruitment and hiring practices. After March 2018, Defendants' Asset and Wealth Management Professionals were still denied employment opportunities with their competitor Defendants due to the no-poach agreement. The denial had nothing to do with qualifications but rather was the product of the institutional "gentleman's agreement" that chained workers to their employers and suppressed any competition or market growth.

---

[4] Dan Margolies, *American Century Settles Federal Antitrust Charges for $1.5 Million*, KCUR (Jul. 1, 2021, 11:50 AM), https://www.kcur.org/news/2021-07-01/american-century-settles-federal-antitrust-charges-for-1-5-million.

16.     Because of the self-concealing nature of Defendants' no-poach agreement, the Asset and Wealth Management Professionals did not become aware of its existence until years later. After executing the NPA, Mariner provided the Administrator overseeing the Victim Compensation Fund with a list of individuals employed by Mariner during the Relevant Time Period, as defined by the NPA. In turn, the Administrator provided the listed individuals with a copy of the NPA and a claim form for the Fund. Thus, Asset and Wealth Management Professionals associated with Mariner only first became aware of the existence of the no-poach agreement on or about August 2023 when they received the notice in the mail from the Administrator. Likewise, American Century followed the same procedure relating to NPA-ACI. Thus, Asset and Wealth Management Professionals associated with American Century first became aware of its existence on or about June 2021 after receiving the notice in the mail from the administrator of NPA-ACI. Neither NPA nor NPA-ACI identified the other co-conspirator(s).

17.     Defendants' senior-level executives boasted among themselves and to other Defendants about the money they would save and did save through the unlawful agreement at the expense of their workers. Defendants knew that their conspiracy harmed their employees, and they knew it was illegal and had to be concealed. Meanwhile, Plaintiffs and Class members had no knowledge of the conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until they received their notices in the mail.

18.     On information and belief, no information about the alleged unlawful activities relating to Mariner was available in the public domain before approximately August 2023. Similarly, no information about the alleged unlawful activities relating to American Century was available in the public domain before approximately June 2021. This is because Defendants knew the no-poach agreement was unlawful, and so they took pains to keep their conspiracy secret and

hidden from their victims. On information and belief, Defendants explicitly agreed to not render their agreements into writing and to orally discuss the no-poach agreement.

19.     A reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' hiring and recruitment practices before receiving the notice in the mail.

20.     Defendants' unlawful actions harmed their employees in ways that will persist for years to come, if not for the rest of their working lives. The conspiracy depressed these workers' wages and compensation for several years, and future employers will use these artificially low salary histories when deciding compensation. It also interfered with the ability of workers to plan their careers and to find employment that best suited their skills and interests. Defendants' conspiracy has already cost employees many millions of dollars and that damage is likely to compound for the rest of their careers.

21.     The effects of Defendants' unlawful conduct also stretch beyond Plaintiffs' and Class members' working careers. Many employers offer retirement plans, such as a 401(k) plan, that allows both the employer and worker to pay into a retirement plan for the worker. Typically, a company will contribute a certain percentage of the worker's salary. But if the worker is earning an artificially low salary, then the amount the employer contributes to the worker's retirement plan is also artificially deflated. Thus, upon retirement, the worker is left with much less in his or her plan than a worker in a competitive market. Accordingly, Plaintiffs and Class members will feel the consequences of Defendants' unlawful no-poach agreements for the rest of their lives.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331; 1332(d)(2); 1337; 1367; and 15 U.S.C. §§ 15(a), 26.

23.     This Court has personal jurisdiction over each of the Defendants pursuant to 15 U.S.C. § 22; Federal Rule of Civil Procedure 4(h)(1)(A); and the Kansas long-arm statue because each Defendant resides in or has its principal place of business in Kansas, employed individuals in Kansas during the Class Period, and/or has had substantial contacts with Kansas in furtherance of the conspiracy.

24.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. 1391(b) and (c) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### A.     Plaintiffs

25.     Plaintiff Jakob Tobler is a citizen and resident of the State of Kansas. Mr. Tobler was employed as a Research Analyst with Tortoise Capital Advisors, LLC from June 2015 to July 2019. Mr. Tobler was also employed as a Senior Associate with TortoiseEcofin from July 2019 to July 2021. At all relevant times, Mr. Tobler worked out of the Leawood, Kansas office. As a result of Defendants' no-poach agreement, Mr. Tobler earned less than he would have absent the illegal agreement. Further, because of Defendants' unlawful no-poach agreement, he was also denied access to better, higher-paying job opportunities and his ability to change employment was restricted.

26.     Plaintiff Michelle McNitt is a citizen and resident of the State of Kansas. Ms. McNitt was employed as a Trading Assistant with Tortoise Capital Advisors, LLC from April 2016 to December 2017. Ms. McNitt was also employed as a Trader with TortoiseEcofin from

December 2017 to March 2022. At all relevant times, Ms. McNitt worked out of the Leawood, Kansas office. As a result of Defendants' no-poach agreement, Ms. McNitt earned less than she would have absent the illegal agreement. Further, because of Defendants' unlawful no-poach agreement, she was also denied access to better, higher-paying job opportunities and her ability to change employment was restricted. Ultimately, because of Defendants' no-poach agreement, Ms. McNitt left the trading profession because she could not find other similar employment.

      **B.**    **Defendants**

27.    Defendant 1248 Holdings, LLC f/k/a Bicknell Family Holding Company, LLC is incorporated in Delaware with its principal place of business in Kansas City, Missouri. During the Class Period, Bicknell Family Holding Company wholly owned, controlled, and/or directed subsidiaries or affiliates, such as executive-level employees, that employed and paid wages, salaries, and/or benefits to Class Members in the United States. It is also identified as an entity that may pay the Victim Compensation Fund under the Non-Prosecution Agreement.

28.    Defendant Mariner Wealth Advisors, LLC f/k/a Mariner Holdings, LLC is incorporated in Kansas with its principal place of business in Overland Park, Kansas. During the Class Period, Mariner Holdings wholly owned, controlled, and/or directed subsidiaries or affiliates, such as executive-level employees, that employed and paid wages, salaries, and/or benefits to Class Members in the United States. Mariner agreed that Mariner Holdings violated 15 U.S.C. § 1 under the Non-Prosecution Agreement as stated herein.

29.    Defendant Mariner, LLC f/k/a Mariner Wealth Advisors, LLC is incorporated in Kansas with its principal place of business in Overland Park, Kansas. During the Class Period, Mariner Wealth Advisors wholly owned, controlled, and/or directed subsidiaries or affiliates, such as executive-level employees, that employed and paid wages, salaries, and/or benefits to Class

Members in the United States. Mariner agreed that Mariner Wealth Advisors, LLC violated 15 U.S.C. § 1 under the Non-Prosecution Agreement as stated herein.

30.     Defendant Montage Investments, LLC, is incorporated in Kansas with its principal place of business in Kansas City, Missouri. During the Class Period, Montage wholly owned, controlled, and/or directed subsidiaries or affiliates, such as executive-level employees, that employed and paid wages, salaries, and/or benefits to Class Members in the United States. Mariner agreed that Montage Investments, LLC violated 15 U.S.C. § 1 under the Non-Prosecution Agreement as stated herein.

31.     Defendant Mariner Capital Advisors, LLC is incorporated in Delaware with its principal place of business in Overland Park, Kansas. During the Class Period, Mariner Capital wholly owned, controlled, and/or directed subsidiaries or affiliates, such as executive-level employees, that employed and paid wages, salaries, and/or benefits to Class Members in the United States. Mariner agreed that Mariner Capital Advisors, LLC violated 15 U.S.C. § 1 under the Non-Prosecution Agreement as stated herein.

32.     Defendant Tortoise Capital Advisors, LLC is incorporated in Delaware with its principal place of business in Overland Park, Kansas. During the Class Period, Tortoise wholly owned, controlled, and/or directed subsidiaries or affiliates, such as executive-level employees, that employed and paid wages, salaries, and/or benefits to Class Members in the United States. Mariner agreed that Tortoise Capital Advisors, LLC violated 15 U.S.C. § 1 under the Non-Prosecution Agreement as stated herein.

33.     Defendant TortoiseEcofin Investments, LLC is incorporated in Delaware with its principal place of business in Overland Park, Kansas. During the Class Period, TortoiseEcofin wholly owned, controlled, and/or directed subsidiaries or affiliates, such as executive-level

employees, that employed and paid wages, salaries, and/or benefits to Class Members in the United States. Mariner agreed that TortoiseEcofin Investments, LLC violated 15 U.S.C. § 1 under the Non-Prosecution Agreement as stated herein.

34.    Defendant American Century Services, LLC is incorporated in Delaware with its principal place of business in Kansas City, Missouri. During the Class Period, American Century Services, LLC participated in the conspiracy with Mariner not to hire or recruit each other's Asset and Wealth Management Professionals.

35.    Defendant American Century Investment Management, Inc. is incorporated in Delaware with its principal place of business in Kansas City, Missouri. During the Class Period, American Century Services, LLC participated in the conspiracy with Mariner not to hire or recruit each other's Asset and Wealth Management Professionals.

36.    Defendant American Century Companies, Inc. is incorporated in Delaware with its principal place of business in Kansas City, Missouri. During the Class Period, American Century Companies, Inc. participated in the conspiracy with Mariner not to hire or recruit each other's Asset and Wealth Management Professionals.

37.    DOES 1-10 are reserved for Mariner's Relevant Related Entities, as defined in the Non-Prosecution Agreement, and Defendants' competitors who conspired with them in furtherance of the no-poach agreement who could not be readily identified.

## FACTUAL ALLEGATIONS

## I.    The Asset and Wealth Management Industry

38.    The U.S. Asset and Wealth Management Industry is the largest asset and wealth management industry in the world and, since the global financial crisis, has experienced one of the longest periods of market growth and economic stability in recent history. Despite COVID-19's

impact on the economy and market, in 2021, client assets in the United States grew $7.9 trillion (19 percent) reaching an all-time high of $50 trillion.[5]

39.     According to the United States Bureau of Labor Statistics ("BLS"), as of May 2022, there were approximately 291,370 financial and investment analysts in the United States earning a mean of roughly $108,970 per year.[6]

40.     Many employers in the Asset and Wealth Management Industry require certain certifications. One such certification is a "CFA" or "Chartered Financial Analyst," which is a "professional designation awarded by the CFA Institute to candidates with proven competence in investment analysis and wealth management."[7] To become a CFA charter holder, candidates must, among other things, have a bachelor's degree, have 4,000 hours of relevant work experience acquired over at least three sequential years, and pass a series of three six-hour exams.[8] According to Daniel Rodriguez, director of operations at Hill Wealth Strategies, "[t]he requirements of becoming a CFA are rigorous and retain a type of elite status, which is another reason why CFAs can be expensive for the financial consumer who hires them[.]"[9] Others have coined the CFA as

---

[5] *See Wealth Management – Worldwide*, STATISTA, https://www.statista.com/outlook/fmo/wealth-management/worldwide (last visited Feb. 2, 2024); John Abraham et al., *From tailwinds to crosscurrents: Resilient growth in wealth management* (Jan. 25, 2023), https://www.mckinsey.com/industries/financial-services/our-insights/from-tailwinds-to-crosscurrents-resilient-growth-in-wealth-management.

[6] U.S. Bureau of Labor Statistics, *Occupational Employment and Wages, May 2022, Financial and Investment Analysts* https://www.bls.gov/oes/current/oes132051.htm (last modified Apr. 15, 2023).

[7] Benjamin Curry, *Charted Financial Analysts are the Rock Stars of Finance* (Nov. 29, 2022, 6:28 PM), https://www.forbes.com/advisor/investing/cfa-chartered-financial-analyst/.

[8] Id.

[9] Id.

the most brutal exam in the world of finance.[10] On information and belief, Mariner required a CFA designation as a basic qualification for some of its asset and wealth management positions.

41.     High barriers to entry and specialized work keep the supply of Asset and Wealth Management candidates low, despite increasing demand. One career consulting company highlighted the labor shortages in the financial industry. According to Challenger, Gray & Christmas, Inc., while the financial industry employs more than 10.3 million Americans, merely 2.7 percent of those working as financial analysts are unemployed.[11] One reason for this labor shortage is retirement. It is estimated that in less than ten years, over one-third of the industry workforce will retire.[12] In the face of this labor shortage, the demand of Asset and Wealth Management Professionals is booming. As World Finance explained, "[a]s firms have continued to grow, thriving on the economic recovery and investor bullishness on global markets, the need for hiring the best, compliance-oriented managers has increased. In the new post-crisis financial services landscape, competition is steeper than ever when trying to put together the strongest employee team."[13]

42.     Basic economics prescribes that the relative scarcity of skilled Asset and Wealth Management Professionals and the high demand for their services increases these employees'

---

[10] Will Martin, *The CFA is the Most Brutal Exam in the World of Finance—Here's What the Questions Look Like* (Apr. 19, 2018), https://finance.yahoo.com/news/cfa-most-brutal-exam-world-074315340.html/

[11] *Labor Shortages Make This the Best Post-Recession Job Market for New Grads*, CHALLENGER, GRAY & CHRISTMAS, INC., https://www.challengergray.com/blog/labor-shortages-make-best-post-recession-job-market-new-grads/ (last visited Feb. 2, 2024).

[12] *Financial Services Industry Faces a Hiring Crisis Amid Economic Uncertainty*, AVIDXCHANGE (Jul. 14, 2022), https://www.avidxchange.com/blog/how-technology-can-help-hiring-crisis-in-financial-services-industry/.

[13] Sandra Kilhof, *Asset Managers in High Demand as Economy Recovers*, WORLD FINANCE, https://www.worldfinance.com/wealth-management/asset-managers-in-high-demand-as-economy-recovers (last visited Feb. 2, 2024).

value, and thus should also increase the compensation that employers pay to secure and retain them. In a competitive labor market, competition between numerous employers for the small pool of eligible candidates would help "actual and potential employees through higher wages, better benefits, or other terms of employment."[14]

43.    Mariner is a major player in the asset and wealth management industry with significant market power. Since 2018, Mariner has been ranked by *Barron's* as a top five investment advisor and currently sits at No. 4, with a median account size of $1-$10 million among of total of nearly 80,000 clients.[15] Mariner has about $65.9 billion in assets under management with more than 1,500 employees across 34 states.[16]

44.    American Century is also a major player in the asset and wealth management industry with significant market power. In 2021, American Century received the U.S. 2021 Best Overall Large Fund Family and Best Equity Large Fund Family Group awards from Refinitiv Lipper Fund Awards.[17] American Century also was named one of the top 10 Best Fund Families by *Barron's*.[18] American Century has about $230 billion in assets under management with more than 1,400 employees across nine global offices.[19]

---

[14] Dep't of Just. & Fed. Trade Commission, *Antitrust Guidance for Human Resource Professionals* (Oct. 2016), https://www.justice.gov/atr/file/903511/download.

[15] *2023 Top 100 RIA Firms*, Barron's, https://www.barrons.com/advisor/report/top-financial-advisors/ria?page=1&mod=advisor_directory_profile (last visited Feb. 2, 2024).

[16] *Mariner Wealth Advisors*, Barron's, https://www.barrons.com/advisor/finder/mariner-wealth-advisors#profile-disclaimers (last visited Feb. 2, 2024).

[17] *2021 Refinitiv Lipper Awards Wins*, American Century Investments, https://www.americancentury.com/newsroom/2021-refinitive-lipper-best-overall-large-firm-best-equity-large-group-awards/ (last visited Feb. 19, 2024).

[18] *Id.*

[19] *A Strategic Partnership with Nomura Asset Management*, American Century Investments, https://www.americancentury.com/about/strategic-partnership-nomura/ (last visited Feb. 19, 2024).

45.     In a competitive market—i.e., a world without Defendants' collusion to suppress wages—Defendants and their co-conspirators would have competed against one another to recruit and hire the most talented Asset and Wealth Management Professionals by offering them better compensation, wages, and benefits. And they would have competed for these workers in every geographic market in which Defendants operate. But for Defendants' conspiracy, Asset and Wealth Management Professionals would have benefited from this free market by securing higher compensation, among other benefits described herein.

46.     Competition for skilled asset and wealth management labor by lateral recruitment and hiring has a significant impact on employees' mobility and compensation. If or when asset and wealth management employers become aware of attractive outside opportunities for their employees, the threat of losing these employees to a competitor encourages improvements in compensation so as to retain valuable labor. If an employer does not adjust its compensation in response to competitive market forces, its Asset and Wealth Management Professionals would be more receptive to recruiting by a rival employer or seek out such position on their own.

47.     Once an Asset and Wealth Management Professional has received an offer from a rival employer, retaining that employee may require an increase in this individual's compensation. But increasing compensation for one person has broader effects. Such an increase tends to impact salaries across a company and market, at least for those who perform comparable work. One mechanism for this widespread effect is salary discovery, in which information about competing salaries causes higher compensation even among those employees not actively looking to switch employers.

48.     Another mechanism by which an individual salary adjustment has broader impact is known as "internal equity." This phenomenon means that employers endeavor to maintain parity

in pay levels across employees within the same categories, as well as maintain certain compensation relationships among employees across different job categories.

49.     Internal equity has been widely explained and documented in economic literature. As a recent article notes, "a long tradition in economic thought—as well as in psychology, sociology, and organizational behavior—has advanced the notion that individuals also care about their pay relative to that of their co-workers."[20] Because employees value internal equity, employers respond by implementing uniform compensation structures that pay comparable compensation for comparable work. As a result, when competition for labor leads to higher wages for some, all comparable workers tend to benefit from overall higher pay structures.

50.     One textbook explains that "[p]ay structure refers to the array of pay rates for different work or skills within a single organization,"[21] and refers to examples of pay structures at companies such as Lockheed Martin.[22] Payroll software companies offer advice to employers on achieving internal equity:

> Internal equity is the comparison of positions within your business to ensure fair pay. You must pay employees fairly compared to coworkers. Employees must also perceive that they are paid fairly compared to their coworkers. Otherwise, they might feel unvalued and leave. It is easy for employees to find out how much other employees earn via the Internet and word of mouth. If an employee works hard but is paid less than her coworkers who do not work as hard, she might become upset about her wages. When you adopt a straightforward and honest payment system, your employees will believe that they are being paid fairly and with equality. This

---

[20] Emily Breza, Supreet Kaur & Yogita Shamdasani, *The Morale Effects Of Pay Inequality* (Nat'l Bureau of Economic Research, Working Paper No. 22491, Aug. 2016) at 1. *See also* Kevin Caves & Hal Singer, *Analyzing High-Tech Employee: The Dos and Don'ts of Proving Classwide Impact in Wage Suppression Cases,* ANTITRUST SOURCE (Feb. 2015), https://www.antitrustinstitute.org/wp-content/uploads/2018/08/CavesSinger.pdf; GEORGE MILKOVICH, et al., COMPENSATION 72 (11th ed. McGraw-Hill 2014) ("Internal alignment, also called *internal equity,* refers to the pay relationships among different jobs/skills/competencies within a single organization.") (emphasis in original).

[21] GEORGE MILKOVICH et al., *supra*, at 72.

[22] *Id.* at 73.

boosts company morale and employee loyalty, bringing many benefits in the long run. . . .

To create fair pay, you compare employees who do similar jobs for your company. You should consider the tasks your employees do. *If two employees perform similar tasks, they should earn similar wages.*[23]

51.     Defendants' salary structures for their Asset and Wealth Management Professionals were governed by internal equity. Defendants set pay structures to ensure that Asset and Wealth Management Professionals with similar backgrounds and seniority were paid at similar levels. Indeed, this is why Defendants conspired—to avoid the systematic increases in salaries for all Asset and Wealth Management Professionals that would occur if they had to compete for talent in a free market.

52.     In a market untainted by their anticompetitive conspiracy, Defendants would have had an incentive to preempt lateral departures by paying their Asset and Wealth Management Professionals enough that they would be less likely to seek or pursue outside opportunities. Similarly, absent collusion, Defendants would have had an incentive to increase compensation for those employees inclined to join a competitor. Such retention measures would have led to increased compensation for all similarly situated employees. That is, the positive compensation effects of hiring employees from competitors lead to higher wage structures generally and are not limited to the individuals who seek new employment or to the particular individuals who would have been recruited.

---

[23] Mike Kappel, *For Fair and Equal Pay, Get to Know Your Business's Internal Equity,* PATRIOT SOFTWARE (Dec. 14, 2015), https://web.archive.org/web/20201126132344/https://www.patriotsoftware.com/blog/payroll/what-is-internal-equity (emphasis added); *see also* Conrado Tapado, *Does Your Company Have Internal Equity?,* PAYSCALE (Apr. 1, 2009) http://www.payscale.com/compensation-today/2009/03/importance-of-internal-pay-equity.

53.     Defendants' conspiracy prevented these procompetitive dynamics from benefiting Asset and Wealth Management Professionals. As a result, Defendants' conspiracy suppressed competition for cross-hiring and recruitment and artificially depressed compensation for workers both within and between competitors. Defendants' conspiracy enabled them to avoid the upward wage pressure that would have been exerted by competition in a free labor market.

54.     Defendants also benefitted from the wage suppression conspiracy by retaining clients and assets. Given the nature of asset and wealth management professional's employment, often, when Asset and Wealth Management Professionals leave, their clients (whose accounts the Asset and Wealth Management Professionals managed) follow them to their new employer. Thus, without this wage suppression conspiracy, Defendants risked losing the accounts managed by their Asset and Wealth Management Professionals and therefore would have suffered a significant loss in margins. Thus, by suppressing wages, Defendants not only benefitted from paying lower wages to their own Asset and Wealth Management Professionals but also retained client accounts that otherwise would have been lost to a competitor.

55.     Instead of competing vigorously in the labor market for skilled Asset and Wealth Management Professionals, Defendants entered into an illegal agreement not to compete against each other when it came to recruiting, hiring, and compensating Asset and Wealth Management Professionals. This agreement was undertaken so that Defendants could pay their Asset and Wealth Management Professionals less money than they would otherwise have to in a free market. Defendants benefited from lower labor costs, all at the expense of their employees who were compensated at artificially low levels. Defendants admitted as much in their agreements with DOJ.

## II.   Defendants' Conspiracy to Restrict Hiring, Recruiting, and Compensation

56.    Defendants already admitted that they conspired to restrict hiring and recruiting each other's competitors, which had the effect of artificially deflating compensation, among other things.

57.    Beginning at least as early as March 2014, Defendants conspired with each other not to hire or recruit each other's employees.[24]

58.    At all times, Defendants conducted this conspiracy in secret, unbeknownst to the employees it harmed. Defendants took pains to keep it secret that they had conspired with each other to suppress labor competition. They hid the existence and terms of the agreement from view due to its illegality and (intended and actual) negative impact on Defendants' employees' compensation and career options.

59.    Defendants designed their conspiracy to enrich themselves by suppressing the compensation of their Asset and Wealth Management Professionals. This suppression was done by limiting, if not altogether eliminating, competition for these workers once they were originally hired by any Defendant. The absence of normal competition had the effect of artificially and bilaterally allocating the labor market among Defendants.

60.    Defendants all drew from the same labor pool. Defendants' conspiracy enabled them to avoid bidding wars to attract and retain employees. Indeed, far from bidding wars, the conspiracy let Defendants avoid paying fair market rates to their Asset and Wealth Management Professionals.

---

[24] While the Non-Prosecution Agreement identifies the relevant time period as March 2014 to March 2018, on information and belief, Defendants' conspiracy extended years beyond 2018.

61.     Defendants' conspiracy was successful: it suppressed the wages, salaries, and benefits paid to Class members since at least 2014 to levels materially lower than they would have been in a competitive market.

62.     Upon facing criminal prosecution from DOJ for its illegal conduct, Defendants executed plea deals with DOJ. These plea deals allowed Defendants to forgo judicial judgment so long as they agreed to, among other things, create a Victim's Compensation Fund to compensate victims who suffered from Defendants' conspiracy and admit that it violated 15 U.S.C. § 1.

## III.     The Effects of the No-Poach Conspiracy

63.     Through their respective agreements with DOJ, Defendants already admitted that their no-poach agreement diminished employee mobility and limited the ability of employees to negotiate for better compensation, benefits, and other terms of employment.

64.     Defendants' conspiracy suppressed the compensation (including salaries, wages, and benefits) offered and paid to their Asset and Wealth Management Professionals while restricting the employment opportunities available to these employees.

65.     Defendants competed for a limited supply of qualified Asset and Wealth Management Professionals.

66.     Absent the conspiracy, Defendants would have vigorously competed to recruit, hire, and retain top Asset and Wealth Management Professionals, including by directly soliciting competitors' employees with better offers.

67.     The United States Department of Justice has been clear that "[a]greements among competitors not to solicit or hire each other's employees harm competition in labor markets in the same way that agreements among them to allocate customers or divide product markets harms

competition in those markets." *In re: Railway Industry Employee No-Poach Antitrust Litigation,* 2:18-MC-798-JFC (W.D. Pa. Feb. 8, 2019), Dkt. 158 at 4 ("DOJ Railway Statement of Interest").

68.     Indeed, the Department of Justice has criminally prosecuted many such market-allocation agreements as *per se* violations of Section 1 of the Sherman Act. *Id.* at 6.

69.     Based on long-standing Supreme Court precedent, the Department of Justice has recognized that "[j]ust as an agreement among competitors to allocate customers eliminates competition for those customers, an agreement among them to allocate employees eliminates competition for those employees." *Id.* at 7.

70.     Agreements not to compete in product and labor markets are virtually indistinguishable in terms of their competitive harms. "[J]ust as allocation agreements in product markets have almost identical anticompetitive effects to price-fixing agreements, no-poach agreements among competing employers have almost identical anticompetitive effects to wage-fixing agreements: they enable the employers to avoid competing over wages and other terms of employment offered to the affected employees." *Id.* at 8.

71.     This dynamic is well illustrated by Defendants' conspiracy and its effects. As it was intended to do, Defendants' agreement resulted in pervasive wage suppression among their Asset and Wealth Management Professionals. The systemic impact of Defendants' conspiracy meant that Defendants paid artificially suppressed wages to their Asset and Wealth Management Professionals and this wage suppression only compounded as the Asset and Wealth Management Professionals progressed in their careers.

72.     Defendants were only able to maintain their artificially low salaries because each of them, as horizontal competitors, agreed not to break ranks and compete with each other based on compensation.

73.     Wage suppression resulting from Defendants' conspiracy impacted Asset and Wealth Management Professionals employed by all Defendants.

74.     Free market competition for labor would lead to upward pressure on compensation as firms sought to lure top talent away from their competitors while ensuring their current employees rejected any outside solicitation. In other words, according to the *Antitrust Guidance For Human Resource Professionals* issued by the DOJ's Antitrust Division and the Federal Trade Commission, "competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment."[25] Conversely, "[r]obbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment."[26]

75.     Defendants conspired to harm their employees by pledging not to solicit or hire each other's workers. Freedom from competition allowed Defendants to pay their employees less than they would have been paid in a competitive market. No-poach agreements like these "enable [] employers to avoid competing over wages and other terms of employment offered to the affected employees" and prevent employees from "reap[ing] the benefits of competition among those employers that may result in higher wages or better terms of employment."[27]

76.     Defendants' conspiracy also cut off the free flow of information within the asset and wealth management labor market, allowing Defendants to keep costs down by obscuring or eliminating the availability of better opportunities elsewhere. Put differently, Defendants'

---

[25] Dep't of Just. & Fed. Trade Commission, *Antitrust Guidance for Human Resource Professionals* (Oct. 2016), https://www.justice.gov/atr/file/903511/download.
[26] Id.
[27] Corrected Statement of Interest of the United States of America at 10, *Stigar v. Dough, Inc. et al.,* No. 2:18-cv-244-SAB (E.D. Wash. Mar. 18, 2019) (Dkt. 34).

conspiracy greatly increased the difficulty their employees faced in searching for better job opportunities.

77.     Direct solicitation from competing employers benefits individual employees because competing employers may make offers that exceed an employee's current compensation. That employee can then secure additional compensation by either changing employers or negotiating increased compensation from her current employer. In addition, employees often share information about offers, which can empower other employees to negotiate with their employers or seek similar or better terms from their current employers.

78.     Defendants' conspiracy also cut off the free flow of information to employers who might otherwise have increased compensation to compete in the labor market. Firms that directly solicit competitors' employees will learn whether their offered compensation is sufficient to lure their competitors' employees, and they are likely to increase compensation offers to ensure they remain competitive. Similarly, firms that learn that their compensation is lower than competitors may preemptively increase compensation to avoid losing employees to poaching.

79.     Defendants' conspiracy successfully controlled labor costs by stifling competition for skilled asset and wealth management labor, suppressing compensation to their employees, and restricting the free movement of those employees by eliminating new employment opportunities.

80.     Defendants benefitted from their conspiracy at the expense of Class members. Defendants could have operated in the asset and wealth management industry without their anticompetitive agreement—i.*e.,* paying competitive wages. Instead, Defendants decided to pay their employees artificially low compensation to avoid the inconvenience of having to compete for skilled labor on its merits.

## **EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT**

81.     Defendants actively and effectively concealed their collusion from its inception in 2014, as alleged herein, from Plaintiffs and the Class. As a result of the inherently self-concealing nature of Defendants' conspiracy, Defendants' fraudulent concealment of their agreements, and through the equitable tolling doctrine and discovery rule, all applicable statutes of limitations affecting Plaintiffs' and the Class's claims have been tolled.

82.     Unlike public prices for goods, employees' salaries are often hidden from public knowledge and difficult to ascertain. This opacity makes it very difficult for one employee to compare wages across employers. Just as a passenger on a flight may have paid more or less than their fellow passengers but has no realistic practical way of discovering this information, pay disparities between employees at competitor companies are, practically speaking, effectively hidden from view.

83.     Short of applying for a job and receiving an offer—a scenario Defendants' conspiracy effectively guaranteed would almost never happen among their co-conspirator horizontal competitors—Asset and Wealth Management Professionals had no way to discover what peer employees at competitors were earning.

84.     Knowing that their anticompetitive agreements were illegal, Defendants did not commit them to writing. The employees whose wages were suppressed, and who had professional opportunities denied to them by the conspiracy, were not informed that their careers were governed by these secret agreements and had no way of discovering this crucial fact.

85.     Along with deliberately leaving no formal trace of their conspiracy (as one would a legitimate agreement), Defendants used various methods to conceal their conspiracy. These carefully selected methods included conducting in-person meetings among the conspirators and

minimizing and concealing the written record of their discussions and agreements. All the while, on information and belief, Defendants represented to their employees that they were following all applicable laws and regulations in Defendants' employment policies.

86.     Among a small group of in-the-know individuals, excluding Plaintiffs' and Class members, Defendants' senior-level executives boasted to each other about the secrecy of the no-poach agreement, giving rise to this Complaint.

87.     It was reasonable for Plaintiffs and Class members to believe that Defendants were enforcing and abiding by their promise of lawful labor policies.

88.     Defendants' active concealment of their conspiracy did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that Defendants conspired to restrict competition for Class members' services through no-poach agreements. Given Defendants' concealment and misrepresentation, Plaintiffs and Class could not have discovered the conspiracy until about August 2023 for Mariner employees and June 2021 for American Century employees, when the respective administrator of NPA and NPA-ACI disclosed the existence of the no-poach agreement.

89.     Before these times, Plaintiffs and the Class reasonably considered the asset and wealth management industry to be competitive, and no reasonable person under the circumstances would have had reason to begin to investigate the legitimacy of wages, salaries, or benefits paid by Defendants to their worker in the United States.

90.     The concealed, suppressed, and omitted facts would have been important to Plaintiffs and the Class because they related to potential employment opportunities and increases in compensation.

91.     Because of Defendants' concealment, the equitable tolling doctrine, and the discovery rule, any applicable statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class have been tolled during the period of concealment.

## CLASS ACTION ALLEGATIONS

92.     Plaintiffs seek relief in their individual capacity and as representatives of all others who are similarly situated. Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring their action on behalf of themselves and the Class defined as: All persons employed as Asset and Wealth Management Professionals by (1) Montage Investments, LLC and its related entities (including the company formerly known as Mariner Holdings, LLC, as well as companies in which Montage Investments, LLC or Mariner Holdings, LLC had a direct or indirect ownership interest of greater than or equal to 50%; and (2) American Century Companies, Inc.; American Century Services, LLC; and American Century Investment Management, Inc. from March 2014 to present ("Class Period").

93.     Specifically excluded from the Class are Defendants and their affiliates, parents, subsidiaries, co-conspirators, whether or not named in this Complaint, senior officers and directors, and human resources personnel of Defendants.

94.     **Class Identity**: The members of the Class are readily identifiable and ascertainable. Defendants and/or their affiliates, among others, possess the information to identify and contact class members.

95.     **Numerosity**: The members of the Class are so numerous that joinder of all of them is impracticable. Plaintiffs do not know the exact size of the Class but believe that there are hundreds of Class members given that Mariner employs more than 1,500 employees and operates in 34 states, and American Century employs over 1,400 employees. Moreover, given the costs of

complex antitrust litigation, it would be uneconomical for many plaintiffs to bring claims and join them together.

96.    **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all member of the Class were damaged by the same wrongful conduct of Defendants.

97.    **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no known interest antagonistic to those of the Class and their interests are aligned with Class members' interests. Plaintiffs were subject to the same anticompetitive no-poach agreement as Class members and suffered similar harms, such as loss of job opportunities, experience, increased compensation, and other benefits. Plaintiffs have also retained competent counsel with significant experience litigating complex class actions, including antitrust actions involving price-fixing, restraints of trade, boycotts, and other anticompetitive practices.

98.    **Commonality and Predominance**: There are questions of law and fact common to the Class such that there is a well-defined community of interest in this litigation. These common questions predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

  a. Whether Defendants entered into a no-poach agreement to restrict competition in the labor market in which Plaintiffs and the other Class members sold their services;

  b. The identity of the participants in the conspiracy;

  c. the duration of the conspiracy;

  d. the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

  e. whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Class;

f.   whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and members of the Class;

g.   whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

h.   the appropriate injunctive and equitable relief for the Class.

99.    Defendants have engaged in a common course of conduct, and Plaintiffs and Class members have been similarly injured by Defendants' illegal and no-poach agreement.

100.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all Class members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

## CLAIMS FOR RELIEF

## COUNT I

### *Per se* Violation of §1 of the Sherman Act, 15 U.S.C. §1
### *(On Behalf of Plaintiffs and the Class)*

101.   Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

102.   In order to avoid criminal prosecution by the United States, Defendants admitted to conspiring with competitors by entering into and managing a bilateral market allocation agreement in the asset and wealth management services industry not to solicit, hire, or otherwise compete for

each other's employees in violation of 15 U.S.C. § 1.  Defendants also agreed that this conduct diminished employee mobility and limited the ability of employees to negotiate for better compensation, benefits, and other terms of employment. Accordingly, Defendants' admissions establish violation of 15 U.S.C. 1.

103.    Defendants knowingly, intentionally, and cooperatively engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1. Specifically, Defendants agreed to restrict competition for Class members' services through a no-poach agreement, as detailed herein, with the purpose and effect of suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

104.    In an agreement with the DOJ to avoid criminal prosecution for its illegal anticompetitive no-poach agreement, Defendant Mariner admitted that it, "through certain of [its] employees, including a senior-level executive, conspired to suppress and eliminate competition by entering into and managing a bilateral market allocation agreement with another firm with which they compete for asset and wealth management professionals . . . not to solicit, recruit, hire, or otherwise compete for each other's employees, in violation of Title 15 United States Code States Code Section 1."

105.    Defendants are horizontal competitors who operate at the same level of the Asset and Wealth Management market when it comes to hiring skilled Asset and Wealth Management Professionals. Defendants compete for skilled labor in this market. Class members would apply for positions across Defendants, as they employed the same or similarly skilled labor.

106.    Defendants' agreement to eliminate competition for skilled asset and wealth management labor allocated the employment market among themselves and had no lawful or legitimate procompetitive business purpose.

107.    Defendants' no-poach agreement is a *per se* violation of Section 1 of the Sherman Act.

108.    DOJ has made clear that no-poach agreements among competing employers are a type of allocation agreement affecting a labor market and that, like other allocation agreements, they are *per se* unlawful.

109.    Defendants' agreements are naked restraints of trade that serve no purpose except for stifling competition, to the detriment of the market for employee labor and the employees comprising that market. Defendants' conspiracy was not reasonably necessary to further any separate, legitimate business transaction or collaboration.

110.    Naked no-poach agreements of the kind entered into by Defendants "are *per se* illegal because they eliminate competition in the same irredeemable way as agreements to allocate customers or markets." DOJ Railway Statement of Interest at 9.

111.    Defendants' conduct injured Plaintiffs and other Class members by depriving them of free and fair competition in the market for their services.

112.    To the extent a relevant market needs to be defined for any reason, the market restrained by Defendants' conduct is the market for labor services of skilled Asset and Wealth Management Professionals in the greater Kansas City area and each of the states where Defendants and their subsidiaries employ skilled Asset and Wealth Management Professionals from March 2014 to present.

113.    As a direct and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and the Class have received compensation that is less than they would have received had the market for their services been free of anticompetitive restraint.

**COUNT II**

**Violation of §1 of the Sherman Act, 15 U.S.C. §1 (Rule of Reason)**
*(On Behalf of Plaintiffs and the Class)*

114.    Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

115.    In order to avoid criminal prosecution by the United States, Defendants admitted to conspiring with competitors by entering into and managing a bilateral market allocation agreement in the asset and wealth management services industry not to solicit, hire, or otherwise compete for each other's employees in violation of 15 U.S.C. § 1.  Defendants also agreed that this conduct diminished employee mobility and limited the ability of employees to negotiate for better compensation, benefits, and other terms of employment. Accordingly, Defendants' admissions establish violation of 15 U.S.C. 1.

116.    Defendants knowingly, intentionally, and cooperatively engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for Class members' services through a no-poach agreement, as detailed herein, with the purpose and effect of suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

117.    Defendants are horizontal competitors who operate at the same level of the Asset and Wealth Management market when it comes to hiring skilled Asset and Wealth Management Professionals. Defendants compete for skilled labor in this market. Class members would apply for positions across Defendants, as they employed the same or similarly skilled labor.

118.    Defendants' agreement to eliminate competition for skilled asset and wealth management labor allocated the employment market among themselves and had no lawful or legitimate procompetitive business purpose.

119.    In addition to being a *per se* violation of Section 1 of the Sherman Act, Defendants conduct is also unlawful under the quick look and rule of reason standards, as there is no cognizable legitimate procompetitive justification for the restraint. To the extent there are any legitimate procompetitive benefits, those benefits can be achieved through less restrictive means.

120.    Defendants' no-poach agreement is a violation of Section 1 of the Sherman Act to the extent any "quick look" analysis is employed. Defendants are competing firms that agreed not to compete for employees. Under basic economic theory, when competitors agree not to hire each other's employees, compensation stagnates.

121.    Defendants' conduct injured Plaintiffs and other Class members by depriving them of free and fair competition in the market for their services.

122.    As alleged above, the market restrained by Defendants' conduct is the market for labor services of skilled Asset and Wealth Management Professionals in each of the states where Defendants and their Related Entities employ skilled Asset and Wealth Management Professionals from March 2014 to present.

123.    As a direct and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiffs and the Class have received compensation that is less than they would have received had the market for their services been free of anticompetitive restraint.

## <u>COUNT III</u>

**Violation of Kansas Restraint of Trade Act, 50-101 *et seq*.**
***(On Behalf of Plaintiffs and the Class)***

124.    Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

125.     In order to avoid criminal prosecution by the United States, Defendants admitted to conspiring with competitors by entering into and managing a bilateral market allocation agreement in the asset and wealth management services industry not to solicit, hire, or otherwise compete for each other's employees in violation of 15 U.S.C. § 1.  Defendants also agreed that this conduct diminished employee mobility and limited the ability of employees to negotiate for better compensation, benefits, and other terms of employment. Accordingly, Defendants' admissions establish violation of Kansas Restraint of Trade Act.

126.     Defendants knowingly, intentionally, and cooperatively engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of the Kansas Restraint of Trade Act. Specifically, Defendants agreed to restrict competition for Class members' services through a no-poach agreement, as detailed herein, with the purpose and effect of preventing full and free competition and suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

127.     Defendants are horizontal competitors who operate at the same level of the Asset and Wealth Management market when it comes to hiring skilled Asset and Wealth Management Professionals. Defendants compete for skilled labor in this market. Class members would apply for positions across Defendants, as they employed the same or similarly skilled labor.

128.     Defendants' agreement to eliminate and prevent full and free competition for skilled asset and wealth management labor allocated the employment market among themselves and had no lawful or legitimate procompetitive business purpose.

129.     Defendants affirmatively concealed from Plaintiffs and the general public the existence of their illegal no-poach agreement through misrepresentations and omissions regarding this conspiracy.

130.     As a direct and proximate result of Defendants' violations of Kansas Restraint of Trade Act, Plaintiffs and the Class have received compensation that is less than they would have received had the market for their services been free of anticompetitive restraint.

## COUNT IV

### Tortious Interference with Business Expectancy
### *(On Behalf of Plaintiffs and the Class)*

131.     Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

132.     In order to avoid criminal prosecution by the United States, Defendants admitted to conspiring with competitors by entering into and managing a bilateral market allocation agreement in the asset and wealth management services industry not to solicit, hire, or otherwise compete for each other's employees in violation of 15 U.S.C. § 1.  Defendants also agreed that this conduct diminished employee mobility and limited the ability of employees to negotiate for better compensation, benefits, and other terms of employment. Accordingly, Defendants' admissions establish tortious interference with business expectancy.

133.     On information and belief, Plaintiffs and Class members pursued and applied for employment opportunities among the competitors. Plaintiffs and Class members were qualified for these employment opportunities. Accordingly, it was probable that Plaintiffs and Class members would have secured employment opportunities, which would have increased their overall compensation and provided better benefits.

134.     Plaintiffs and Class members were unfairly robbed of these employment opportunities through Defendants' illegal and anticompetitive scheme. With knowledge of these employment opportunities, Defendants intentionally and cooperatively concocted their covert agreement to restrict competition for Class members' services—without Class members' knowledge—through a no-poach agreement, as detailed herein, with the purpose and effect of

suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

135.    Had Defendants no-poach agreement not existed, Plaintiffs and Class members were reasonably certain to have secured those sought after employment opportunities.

136.    As a direct and proximate result of Defendants' tortious interference, Plaintiffs and the Class have received compensation that is less than what they would have received had the market for their services been free of anticompetitive restraint.

## COUNT V

### Unjust Enrichment
### *(On Behalf of Plaintiffs and the Class)*

137.    Plaintiffs repeat and reallege every allegation set forth in the preceding paragraphs.

138.    Plaintiffs and Class members have an interest, both equitable and legal, in their injuries that arose from Defendants' illegal and anticompetitive no-poach agreement.

139.    Plaintiffs and Class members conferred a benefit on Defendants in the form of labor.

140.    Defendants appreciated and had knowledge of the benefits conferred upon them by Plaintiff and Class members.

141.    In exchange for receiving Plaintiffs' and Class members' labor, which Defendants were able to use for their own business purposes and which provided actual value to Defendants, such as commercial gain, Defendants—rather than pay Class members a fair compensation—initiated their covert scheme to artificially deflate the Class members' wages and compensation in the asset and wealth management market. Thus, Defendants received discounted labor, increasing its bottom line, while Class members received artificially deflated compensation.

142.     As a result of Defendants' conduct, Plaintiffs and Class members suffered actual damages as described herein. Under principles of equity and good conscience, Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds they received from Plaintiffs and Class members, including damages equaling the difference between the amount of Class members' actual compensation and the amount of Class members' compensation had the market for their services been free of anticompetitive restraint.

**PRAYER FOR RELIEF**

143.     WHEREFORE, Plaintiffs, on behalf of themselves and the Class set forth herein, respectfully request the following relief:

A.      That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

B.      That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.      That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

D.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E.      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonably attorneys' fees, costs, and expenses; and

F.      That the Court award pre- and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL AND DESIGNATION OF PLACE OF TRIAL

Plaintiffs hereby request a trial by jury of all issues so triable. Plaintiffs designate the federal court in Kansas City, Kansas as the place of trial.


Dated: February 23, 2024                         Respectfully submitted,

*/s/ George A. Hanson*
George A. Hason        KS Bar # 16805
Stefon J. David         *(PHV forthcoming)*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
hanson@stuevesiegel.com
david@stuevesiegel.com


Rowdy B. Meeks        KS Bar # 16068
**ROWDY MEEKS LEGAL GROUP LLC**
8201 Mission Rd., Suite 250
Prairie Village, KS 66208
Telephone: (913) 776-5585
Rowdy.meeks@rmlegalgroup.com

***COUNSEL FOR PLAINTIFFS***
***AND THE PROPOSED CLASS***